UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JAMES CRICHTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:09-CV-592 |
| | ) | (VARLAN/GUYTON) |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This civil action is before the Court on plaintiff James Crichton's Motion for Partial Summary Judgment to Liability [Doc. 20] in which plaintiff asserts that there is no disputed issue as to any material fact and plaintiff is entitled to partial summary judgment in regard to the liability of defendant Tennessee Valley Authority ("TVA"). TVA has responded in opposition [Doc. 53]. Plaintiff has not filed a reply and the time for doing so has passed. *See* E.D. TN. L.R. 7.1(a), 7.2.

The Court has carefully reviewed the pending motion and TVA's response in opposition, along with the supporting documents and exhibits filed by the parties, all in light of the relevant law. For the reasons stated herein, plaintiff's motion for partial summary judgment will be denied.

**I.     Relevant Facts and Procedural History**

The claims in this action arise out of the December 22, 2008 failure of a coal ash containment dike at TVA's Kingston Fossil Fuel Plant (the "KIF plant") in Roane County,

Tennessee. The containment dike retained a pond used to dispose of coal ash sludge produced at the KIF plant. This coal ash sludge was created by the burning of coal at the KIF plant's coal-fired electricity generation plant. As a result of the dike failure, approximately 5.4 million cubic yards of coal ash sludge spilled from the 84-acre containment pond to an adjacent area of about 300 acres, consisting of primarily the Watts Bar Reservoir, the Clinch and Emory Rivers, and government and privately owned shoreline properties.

Following the coal ash spill, TVA and the Environmental Protection Agency (the "EPA"), responded pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. ch. 103, ("CERCLA"), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. pt. 300 (2008) (the "NCP"). During the initial emergency response phase, and pursuant to CERCLA, Executive Order No. 12,580,[1] and the NCP, the EPA delegated its authority to TVA to engage in coal ash removal actions. *See* 42 U.S.C. §§ 9604(a)-(b); *id.* § 9615 (authorizing the President to delegate duties and powers under CERCLA); 40 C.F.R. § 300.5. The EPA terminated the initial emergency response phase on January 11, 2009 and transferred lead agency authority to TVA for further clean-up, removal, and remediation actions. Since this time, all coal ash response and removal actions have been within TVA's delegated authority under CERCLA and Executive Order No. 12,580. On January 12, 2009, in a "coordinated oversight approach"

---

[1] Executive Order No. 12,580, 52 Fed. Reg. 2923, at (e)(1) (Jan. 23, 1987), 3 C.F.R. 193 (1987 Comp.), *superseding* Executive Order No. 12,316, 46 Fed. Reg. 42, 237 (Aug, 20, 1981) (providing for the delegation of presidential authority under CERCLA to the Administrator of the EPA).

adopted by TDEC and the EPA, TDEC ordered TVA to comply with an order directing it to engage in various spill response and remediation efforts, implement removal measures, assess all of TVA's coal ash disposal facilities, submit reports detailing and analyzing the causes of the dike failure at the KIF plant, and submit a Corrective Action Plan (the "CAP").[2]

Following the coal ash spill, and during TVA's ongoing removal and remediation efforts, seven cases were filed against TVA by individuals who alleged that they resided, owned property, and/or owned businesses within the area of the coal ash spill. Not all of the factual allegations or claims contained in the complaints were alike. However, on balance, the plaintiffs in these first seven cases asserted similar claims and causes of action grounded in tort law. TVA then filed a motion to dismiss or for summary judgment in all seven of the cases. In that motion, TVA argued that the federal discretionary function doctrine applies to TVA, applies to all of the plaintiffs' tort claims, and requires dismissal or summary judgment of all the plaintiffs' tort claims. *See Mays v. TVA*, 3:09-CV-6, *et al.*, — F. Supp. 2d —, 2010 WL 1233966, at *8 (E.D. Tenn. Mar. 26, 2010).

On March 26, 2010, this Court entered an order granting in part and denying in part TVA's motion to dismiss or for summary judgment. *See Mays*, 2010 WL 1233966, at *8. The Court granted the motion to the extent that the plaintiffs' claims pertain to TVA's policy decisions to build and keep in operation the coal ash storage system at the KIF plant, granted the motion to the extent the plaintiffs' claims pertain to TVA's removal and remediation

---

[2] *See Mays v. TVA*, 3:09-CV-6, *et al.*, — F. Supp. 2d —, 2010 WL 1233966 at *1-*5 (E.D. Tenn. Mar. 26, 2010) for a more complete summary of the background facts of the coal ash spill.

3

conduct following the coal ash spill, and denied the motion to the extent the plaintiffs' claims pertain to TVA's use, maintenance, and upkeep of the coal ash storage system at the KIF plant.[3] *Id.* at *35.

Following the filing of these seven cases, approximately fifty separate cases were filed pertaining to the coal ash spill, including this action. Plaintiff filed this complaint against TVA on December 21, 2009, alleging that the coal ash sludge from the December 22, 2008 spill flowed onto his property and damaged his personal and real property [*see* Doc. 1]. The factual allegations and claims in plaintiff's complaint are substantially similar to the factual allegations and claims in the first seven cases filed in this Court that were the subject of the Court's order on TVA's motion to dismiss or for summary judgment. *See Mays*, 2010 WL 1233966. Further, the factual allegations and claims in plaintiff' complaint are substantially similar to those asserted in the approximately fifty other cases, filed after the initial seven cases.

Plaintiff's complaint asserts various causes of action based in tort law—negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability [Doc. 1]. Plaintiff also asserts a claim for inverse condemnation [*Id.*]. On February 19, 2010, plaintiff filed the instant motion for partial summary judgment [Doc. 20]. As stated above, TVA filed a response in opposition, asserting that plaintiff's motion for partial summary judgment should

---

[3] In TVA's motion to dismiss or for summary judgment filed in these seven cases, TVA also requested that the plaintiffs' inverse condemnation claims be dismissed for failure to state a claim. *Mays*, 2010 WL 1233966, at *8. The Court denied that request. *Id.* at *35.

be denied in its entirety. Plaintiff has not filed a response and the time for doing so has passed.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Anderson*, 477 U.S. at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial -

whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

**III.   Analysis**

In moving for partial summary judgment, plaintiff asserts that TVA is not immune from suit under the discretionary function doctrine and there is no genuine issue of material fact that TVA did not properly maintain the coal ash impoundment area and containment dike at the KIF plant and that TVA's improper maintenance caused the December 22, 2008 coal ash spill. Plaintiff also asserts there is no genuine issue of material fact that TVA is liable for the discharge of the coal ash under the Clean Water Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq.*,[4] the Tennessee Water Quality Control Act (the "TWQCA"), T.C.A. §§ 69-3-101, *et seq.*, the Resource Conservation and Recovery Act (the"RCRA"), 42 U.S.C. §§ 6901, *et seq.*,[5] and the Tennessee Solid Waste Disposal Act (the "TSWDA"), T.C.A. §§ 68-211-101, *et seq.* Plaintiff also asserts that there is no issue of genuine material fact that plaintiff was severely and directly harmed as a result of TVA's conduct. Further, plaintiff asserts that toxic sludge from the coal ash spill flowed onto his property, deprived him of lake access, and that particles in the air from the coal ash spill have interfered with his right to enjoy, use,

---

[4] The CWA is referred to in plaintiff's brief as the Federal Water Pollution Control Act (the "FWPCA"). The FWPCA is commonly known and referred to as the CWA.

[5] The RCRA is referred to in plaintiff's brief as the Solid Waste Disposal Act (the "SWDA"). The RCRA amended the SWDA in its entirety and thus, the SWDA is often referred to as the RCRA.

6

and dispose of his property. Lastly, plaintiff asserts that because there are no genuine issues of material fact in regard to TVA's liability, the issue of damages is the only issue that remains pending before this Court.

In opposition, TVA asserts that genuine issues of material fact exist and plaintiff has not shown that a nondiscretionary act or omission on the part of TVA caused the coal ash spill. TVA also asserts that the regulatory statutes cited by plaintiff do not negate the applicability of the discretionary function doctrine to plaintiff's tort claims and do not provide a private right of action for damages. Finally, TVA asserts that there was no coal or fly ash on plaintiff's property and plaintiff's theory that he was damaged because of the fly ash in the navigable waters near the coal ash spill site and on the government's shoreline strip fails to state a legally cognizable claim.

### A. The Discretionary Function Doctrine Applies to TVA

This Court has previously held, in the context of this coal ash spill of December 22, 2008 at the KIF plant, and in response to substantially similar factual allegations and claims, that the discretionary function doctrine applies to TVA and precludes TVA's liability for certain claims arising out of the coal ash spill. *See Mays,* 2010 WL 1233966, at *10-*24. The discretionary function doctrine, which generally arises in the context of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), (the "FTCA"), provides that the waiver of sovereign immunity by the United States does not extend to:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal

agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). TVA does not benefit from the discretionary function doctrine as it is embodied in the FTCA. Rather, TVA's waiver of sovereign immunity is through the "sue or be sued" clause in its own enabling legislation, the Tennessee Valley Authority Act (the "TVA Act"). 16 U.S.C. § 831c(b). Both the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have interpreted this language as "making the TVA liable to suit in tort, subject to certain exceptions." *United States v. Smith*, 499 U.S. 160, 168-69 (1991) (citing *Peoples Nat. Bank of Huntsville, Ala. v. Meredith ("Meredith")*, 812 F.2d 682, 684-85 (11th Cir. 1987)); *see also Queen v. TVA*, 689 F.2d 80, 85 (6th Cir. 1982), *cert. denied*, 460 U.S. 1082 (1983).

While acknowledging that the "sue and be sued" clause in the TVA Act constitutes a "broad waiver of sovereign immunity," the Sixth Circuit has held that "in certain limited situations the TVA is exempt from liability arising out of the exercise of wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable." *Edwards v. TVA*, 255 F.3d 318, 322 (6th Cir. 2001) (quoting *Queen*, 689 F.2d at 86); *see also Fortner v. TVA*, No. 3:04-CV-363, 2005 WL 2922190, (E.D. Tenn. Nov. 4, 2005); *Meredith*, 812 F.2d at 684-85. The Sixth Circuit has stated that this non-liability is not an "incident of immunity but the result of the entitlement

of the TVA, when it acts solely as a governmental entity." *Queen*, 689 F.2d at 86.[6] This exemption from liability for certain "wholly governmental functions" has been analyzed pursuant to the same analysis as that applied to the immunity resulting from the discretionary function doctrine of the FTCA. *See, e.g., Edwards*, 255 F.3d at 322 (applying the discretionary function doctrine to TVA); *Sligh v. TVA*, 532 F. Supp. 168 (D.C. Tenn. 1980) (same); *Meredith*, 812 F.2d at 685 (same).

While plaintiff argues that TVA is not immune from suit for its activities associated with its use and sale of electric energy, the Court respectfully disagrees. The TVA Act explicitly recognizes TVA's authority "[t]o produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and to acquire, operate, and maintain lands and structures to carry out the purposes of the TVA Act. *See id* §§ 831c(h)-(i). In *Queen*, the Sixth Circuit affirmed the application of the discretionary function doctrine to power-related conduct TVA was statutorily authorized to engage in, specifically, the statutory authority "'to make studies, experiments and determinations to promote the wider and better use of electric power for agricultural and domestic use, or for small or local industries.'" *Queen*, 689 F.3d at 84 (quoting TVA's brief in that case which quotes 16 U.S.C. § 831i). In *Edwards*, the Sixth Circuit affirmed a district court's application of the discretionary function doctrine to TVA's

---

[6] In *Queen*, a TVA engineer appeared on a broadcasting program and expressed a negative opinion regarding the plaintiff's invention, a device intended to reduce the electric bills for consumers of electric power. *Queen*, 689 F.2d at 82-83. The plaintiff brought a common law defamation action against TVA, seeking damages and injunctive relief. *Id.* The Sixth Circuit affirmed the judgment of this district court, granting TVA's motion for summary judgment on discretionary function grounds. *Id.* at 85-86; *see also Queen v. TVA*, 508 F. Supp. 532 (E.D. Tenn. 1980).

9

conduct in the maintenance of its hydroelectric dams–which is power-related conduct–and conduct regarding "how [TVA] . . . make[s] federal lands safe for visitors." *Edwards*, 255 F.3d at 325.[7] As stated in this Court's previous order in *Mays* on TVA's motion to dismiss or for summary judgment on the discretionary function doctrine:

> [T]he Court will consider TVA's status as a governmental agency and instrumentality, and whether its conduct in these cases was in furtherance of activities, a purpose, and a function that TVA was statutorily authorized to pursue. Because TVA was authorized by Congress to "produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and to use and develop technology for the generation of electric power, Congress made the governmental choice of authorizing TVA to provide communities with various types of electric power. Such conduct in a federally created agency and instrumentality—the exercise of a statutorily authorized purpose—constitutes the exercise of a "governmental function" to which the discretionary function doctrine applies.

*Mays*, 2010 WL 1233966, at *13. Thus, because plaintiff has advanced no new arguments or legal authority that might alter the Court's previous analysis, the Court will continue to apply the discretionary function doctrine to TVA and its conduct relating to its power production purpose and function, thus encompassing the challenged conduct in this case.

### B. The *Gaubert* Test

In *United States v. Gaubert*, the Supreme Court established a two-part test to be applied in determining whether a particular claim falls under the discretionary function

---

[7] In *Edwards*, the plaintiff's son slipped on a rocky shoreline and fell into the Tennessee River near the Fort Loudoun Dam, a dam maintained and operated by TVA. *Edwards*, 255 F.3d at 320. The plaintiff brought a wrongful death action against TVA, seeking compensatory and punitive damages and arguing that TVA had failed to adequately maintain existing safety measures and failed to take additional safety measures to protect the public. *Id.* The Sixth Circuit affirmed the judgment of this district court, which had granted summary judgment in favor of TVA on discretionary function grounds. *Id.* at 325.

doctrine to the federal government's waiver of sovereign immunity. *See United States v. Gaubert*, 499 U.S. 315, 322-25 (1991); *Berkovitz by Berkovitz v. United States ("Berkovitz")*, 486 U.S. 531, 536-37 (1988); *see also Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). The first part of the *Gaubert* test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. *Gaubert*, 499 U.S. at 323-24. If so, the discretionary function doctrine does not apply because there was no element of judgment or choice in the challenged conduct. *Id.* at 322. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536).

If the challenged conduct is determined to involve an element of judgment, the second part of the *Gaubert* test looks to see "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). "[T]he purpose of the exception is to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323 (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense ("Varig Airlines")*, 467 U.S. 797, 814 (1984)). The exception, when properly construed, protects only governmental actions and decisions based on considerations of public policy. *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "In sum, the discretionary function doctrine insulates the government from liability if the

action challenged in the case involves the permissible exercise of policy judgment. *Berkovitz*, 486 U.S. at 537.

### C. Application of the *Gaubert* Test to Plaintiff's Claims

#### 1. Whether TVA's Conduct in Relation to the Coal Ash Spill Violated a Mandatory Federal or State Statute, Policy, or Regulation that Dictated a Specific Course of Conduct

For purposes of the discretionary function doctrine, a controlling statute, regulation, or administrative policy must dictate a specific course of action relevant to the challenged conduct. *Rosebush*, 119 F.3d at 442; *see Berkovitz*, 486 U.S. at 536 (stating that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow"). Thus, the proper inquiry for purposes of the discretionary function doctrine is whether the challenged conduct violated a governing, specific, mandatory directive. For purposes of the first part of the *Gaubert* test, it is not the ultimate result of the challenged conduct and whether that result violated a specific statute, regulation or policy, but whether there was a violation of a specific, mandatory directive in the conduct leading up to the ultimate result. *See, e.g., Varig Airlines*, 467 U.S. 797. At this stage of the inquiry, the issue of whether the challenged conduct was negligent is irrelevant. *Rosebush*, 119 F.3d at 442 (citing *Autery v. United States*, 992 F.2d 1523, 1527-28 (11th Cir. 1993)).

Plaintiff claims that TVA caused the discharge of toxic pollutants into navigable waters and such conduct is nondiscretionary and prohibited under the CWA and the TWQCA. *See* 33 U.S.C. §§ 1251, *et seq.*; T.C.A. §§ 69-3-101, *et seq.* Plaintiff also claims

that TVA's conduct relating to the coal ash spill caused the release of solid waste in violation of the RCRA and the TSWDA. *See* 42 U.S.C. §§ 6901, *et seq.*; T.C.A. §§ 68-211-101, *et seq.* Plaintiff argues that TVA's permits under these statutes, a National Pollutant Discharge Elimination System ("NPDES") permit and a Class II Landfill Permit, prohibited the discharge of pollutants and solid wastes and thus, TVA is in violation of these permits and these statutes.[8] Because the first part of the *Gaubert* test requires a mandatory statute, regulation, or policy that allows no judgment or choice, the Court will now inquire into whether any of the statutes cited by plaintiff prescribe and require a specific course of conduct which TVA failed to follow. *Gaubert*, 499 U.S. at 323-24; *Berkovitz*, 486 U.S. at 536.

The CWA[9] and the TWQCA[10] make it unlawful to discharge pollutants, sewage, or industrial wastes into navigable waters. *See* 33 U.S.C. § 1311(a); T.C.A. § 69-3-108(b)(1), (6). In the motion for partial summary judgment, plaintiff asserts that TVA caused the unlawful discharge of pollutants and because TVA was not permitted to discharge such pollutants under these statutes and under its permits, all the elements for violations of these statutes have been satisfied.

---

[8] *See Mays*, 2010 WL 1233966, at *2 n.9 (describing TVA's NPDES permit and its Class II Landfill Permit).

[9] Making illegal "pollutant discharges except in compliance with law." 33 U.S.C. § 1311(a).

[10] Making unlawful the "alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state; . . . [and t]he discharge of sewage, industrial wastes or other wastes into waters, or a location from which it is likely that the discharge substance will move into waters[.]" T.C.A. §§ 69-3-108(b)(1), (6).

13

The Court disagrees. Plaintiff has misconstrued the purpose of the first part of the *Gaubert* test. The prohibitions in these statutes on the discharge of pollutants are not the type of mandatory statutes allowing no judgment or choice as required under *Gaubert*. The *Gaubert* test does not look at the ultimate result of the challenged conduct, which may constitute a violation of the relevant statute or regulation, but at whether there was a violation of a specific, mandatory statute or regulation in the conduct leading up to the violation. Besides asserting that there was a prohibited result, plaintiff has not alleged or shown that TVA violated any specific part of these statutes. Accordingly, the Court does not find that TVA has violated a specific mandatory directive under the CWA or the TWQCA and thus, in this regard, TVA's conduct satisfies the first part of the *Gaubert* test.

The same is true for plaintiff's argument that TVA's conduct relating to the coal ash spill caused the release of solid waste in violation of the RCRA[11] and the TSWDA.[12] *See* 42 U.S.C. §§ 6901, *et seq.*; T.C.A. §§ 68-211-101, *et seq.* Similar to plaintiff's allegation that TVA violated the CWA and the TWQCA, plaintiff's allegations concerning the RCRA and the TSWDA also attack the result of TVA's challenged conduct—the release of substances

---

[11] Stating that "[e]ach department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements . . . respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements . . . ." 42 U.S.C. § 6961.

[12] The TSWDA provides for the promulgation of the Tennessee Solid Waste Rules (the "Tennessee Solid Waste Rules"), Tenn. Comp. R. & Reg. §§ 1200-1-7-.01, *et seq*. The Tennessee Solid Waste Rules govern solid waste disposal in Tennessee and require that solid waste disposal facilities operate in accordance with a permit from TDEC. *See* Tenn. Comp. R. & Reg. § 1200-1-7-.02(b)(1).

into surrounding waterways. Moreover, plaintiff has not alleged mandatory and specific courses of action required by the these acts and violated by TVA in the course of its conduct leading up to the coal ash spill. Accordingly, the Court finds that TVA's conduct in this regard also satisfies the first part of the *Gaubert* test.

The Court notes that, to the extent plaintiff has argued that the CWA and the RCRA contain waivers of sovereign immunity which authorize plaintiff's tort claims against TVA, the Court need not address that assertion at present because plaintiff has not alleged a violation of any specific, mandatory directive in the CWA or the RCRA in respect to TVA's conduct at the KIF plant. Such an analysis would require the Court to make a determination of the reach and extent of the waiver of immunity under the CWA and the RCRA, and a determination of whether plaintiff's tort claims under Tennessee's common law constitute "requirements" for the purposes of these statutes. *See* 33 U.S.C. § 1323(a); 42 U.S.C. § 6961(a). Such an analysis and determination is not necessary for the Court's present Memorandum Opinion and Order.

> 2. **Whether TVA's Conduct in Relation to the Coal Ash Spill is Susceptible to Policy Analysis**

Having determined that none of the federal or state statutes cited by plaintiff contain specific, mandatory directives dictating specific courses of action of the type required to take TVA's conduct out of the first part of the *Gaubert* test, the Court must now determine whether plaintiff has asserted claims that take TVA's conduct out of the second part of the *Gaubert* test. As stated in *Berkovitz*, "[t]he basis for the discretionary function exception was

Congress' [*sic*] desire to 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Berkovitz*, 486 U.S. at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814). "[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id.* at 537. Thus, the appropriate inquiry is whether the conduct challenged by plaintiff was grounded in considerations of public policy and involved the permissible exercise of policy judgment. *See Gaubert*, 499 U.S. at 324-25; *Berkovitz*, 486 U.S. at 537; *Varig Airlines*, 467 U.S. at 814.

It is important to note that the appropriate analysis under the discretionary function doctrine is not whether a decision was made that *involved* policy considerations of a social, economic, or political type—as virtually every decision of a large federal agency and instrumentality such as TVA might. Rather, the appropriate analysis is whether the particular decision or set of decisions giving rise to the conduct are *grounded* in such policy considerations. *Gaubert*, 499 U.S. at 323 (emphasis added). To this end, the Supreme Court has recognized that discretionary decisions are not limited to decisions involving policymaking or planning functions, but that "[d]ay-to-day management" type decisions, such as those that "regularly require[] judgment as to which of a range of permissible courses is the wisest[]" may also constitute discretionary decisions. *Id.* at 324-25. Furthermore, it is the nature of the conduct in question that should be analyzed to determine whether it is of

16

the type that Congress sought to protect, *id.* at 322,[13] and whether such conduct can be said to be "based on the purposes that the regulatory regime seeks to accomplish."[14] *Id.* at 325 n.7.

With this in mind, the Court has reviewed the claims asserted in plaintiff's complaint and the motion for partial summary judgment.[15] In the motion, plaintiff alleges that "it is clear that the dike breach . . . was the result of the nondiscretionary neglect of TVA and its employees or agents and that it was a foreseeable, if not inevitable event." [Doc. 21, p. 3]. In the Court's analysis in its decision entered in *Mays* regarding the second part of the *Gaubert* test, the Court distinguished the different claims of the plaintiffs, noting that certain policy decisions of TVA were shielded from suit under the discretionary function doctrine, while certain other decisions were not. *Mays*, 2010 WL 1233966, at *22. The policy

---

[13] "'[I]t is the nature of the conduct, rather than the status of the actor,' that governs whether the discretionary function exception applies." *Gaubert*, 499 U.S. at 322 (quoting *Varig Airlines*, 467 U.S. at 813).

[14] "There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Gaubert*, 499 U.S. at 325 n.7.

[15] The Court notes that its order in *Mays* on TVA's motion to dismiss or for summary judgment based on the discretionary function doctrine was entered after plaintiff filed his motion for partial summary judgment. Accordingly, plaintiff was not able to take into consideration the Court's determinations in that order. As this case is presently viewed as a related but not consolidated case to the other cases arising out of the coal ash spill, the Court has considered plaintiff's arguments separately but has not been presented with anything that changes or alters its previous determinations.

decisions that are shielded under the discretionary function doctrine include decisions regarding whether to have a wet coal ash storage facility, decisions regarding where to locate the coal ash disposal facilities and the design and construction of the facilities, decisions in regard to what policies and procedures would govern the coal ash disposal, decisions such as whether to implement modifications or changes to the facilities, and decisions regarding whether to continue disposing of the coal ash in a wet storage system. *Id.* Decisions and conduct that the Court found were not shielded by the discretionary function doctrine include, but are not necessarily limited to:

> Neglect of the facilities, neglect of day-to-day maintenance, ignoring policies and procedures, failing to implement corrective measures or modifications under those policies or procedures, and the failure to have in place policies and procedures.

*Id.* at *24 (internal citations omitted).

Whether TVA was negligent in regard to the decisions and conduct mentioned above will necessarily be a fact intensive inquiry and will require more detailed allegations and evidence than that stated and cited in plaintiff's brief. Moreover, plaintiff has not identified any specific decision or conduct on the part of TVA or shown it to be within the Court's determination of what may constitute a nondiscretionary act for which TVA may be liable. Rather, plaintiff relies on conclusory statements of liability and various conclusions listed in the "Inspection Report, a Review of the Kingston Fossil Plant Ash Spill Root Cause Study and Observations About Ash Management" (the "OIG Report"), a report issued on July 23, 2009 by the Office of the Inspector General for TVA [*see* Docs. 20-1, -4]. While the Court

has reviewed the OIG Report and notes that it is indeed relevant to plaintiff's claims, the Court does not consider the OIG Report, standing alone, as determinative on the issues of whether TVA was negligent in its conduct and its decisions that fall outside the discretionary function doctrine, particularly when plaintiff has not identified the specific nondiscretionary conduct and decisions.

Thus, while plaintiff has asserted that there are no genuine issues of material fact in regard to whether TVA properly maintained the coal ash facilities and that TVA's negligent conduct resulted in the coal ash spill, plaintiff has not identified the specific conduct or decisions of TVA that were nondiscretionary and for which TVA may be liable. Further, and even if plaintiff had alleged specific nondiscretionary conduct and decisions for which TVA may be liable, plaintiff has not made sufficient evidentiary showings indicating such negligence. While the findings of the OIG Report and the affidavit and deposition of plaintiff are relevant, such findings and evidence is not evidence sufficient to establish that there are no genuine issues of material fact and that plaintiff is entitled to judgment as a matter of law as to whether TVA was negligent in its use, maintenance, and upkeep of the KIF plant with its coal ash storage facilities.

In light of the above, and because plaintiff's motion for partial summary judgment does not establish that plaintiff is entitled to judgment as a matter of law, the Court need not consider at this time plaintiff's allegations that coal ash flowed onto and covered his property, that he has been deprived of his lake access, and that the coal ash particles released

into the air have interfered with his right to enjoy, use, and dispose of his property onto his property.

## IV. Conclusion

Because the Court finds that there continue to be a number of genuine issues of material fact that preclude summary judgment on any of plaintiff's claims, and for the other reasons stated herein, plaintiff James Crichton's Motion for Partial Summary Judgment to Liability [Doc. 20] is hereby **DENIED.**

IT IS SO ORDERED.

                                               s/ Thomas A. Varlan
                                               UNITED STATES DISTRICT JUDGE